You may be seated. We'll wait for counsel to get situated. Our next case is Alfaro v. McHenry. Mr. Ossorio, I'm not butchering your name? No, that's perfect, Your Honor. All right. Good to have you with us. Good to see you, Your Honor. Thank you. You may please the court. So let's start with the point of agreement here. The parties agree that when an I.J. makes findings of facts, the BIA must defer to them unless they're clearly erroneous. Where we start to have some disagreement here is it's our belief that in this case, that rather than defer to the I.J.'s factual findings on the likelihood of torture, the BIA inserted itself into the role of de novo fact finder and disagreed with the I.J.'s weighing of the evidence. Additionally, even if the I.J. committed clear error, it's not proper for the BIA to use this as cover to make its own factual findings. Instead of redlining the I.J.'s decision and filling in the blanks itself, it should have remanded to the I.J. to point out what it believed the errors to be. For example, if we had the opposite case where the I.J. had not found that it was more likely than not that the individual would be tortured, the B.I. should then remand pointing out where there was probable evidence or evidence that the I.J. failed to take into consideration. The B.I. wouldn't in its own instance make a new predictive on the finding of the likelihood of torture. And then third, we still continue to disagree, and I know obviously Lopez-Sorto came out in the middle of the litigation of this case. I still think there's some unanswered questions after Lopez-Sorto, and I would point the court to, I believe it's B.A. It's J.A. page 5, the B.I.'s footnote 5, and in there they specifically say that an applicant for a protection under CAT may propose multiple different chains of events that could lead to the likelihood of torture, but they must establish at least one where each step of the hypothetical chain of events is more likely than not to occur. And I believe that's just bad math because, for example, if you had one entity, let's say the Salvadoran police in this case, that there was a 45% likelihood of chance of torture, you could establish a chain of events that each step in the chain could not have a more than 50% chance, but still statistically you could arrive at 45%. Let's say there were five steps in the chain. Four steps could be at 100%, and the last step, or I'm sorry, you could have different versions that were very close statistically where you wouldn't have to have each chain have more than 50%. I'm not sure if I'm explaining that correctly because I get myself lost sometimes too. But then let's say you could also have here the vigilante squads that had a 10% chance. So in the aggregate we would be at 55%, but each step in each of those chains would not be more likely than not. So I still think it's incorrect math to continue to hold an applicant to that standard. So going back to our first argument about the clear error, this judge issued a 13-page, single-space, well-reasoned decision. This judge, you mean the adjunct? Yes, Your Honor, Judge Noza-Stevens. And not only did she issue that final decision that was 13 pages and single-space and cite it to the record more than 50 times, her review, I would argue that her first decision should have been upheld. Obviously the BIA had a single member in both cases that dissented, agreeing that they would have dismissed the DHS's appeal. But when we consider the Supreme Court standard here of implausible and illogical based off of the record before it, I just don't think that the BIA has satisfied that standard to overturn. And it's critical here when we're considering— How do you think that we should think about that? The BIA here is pretty clear that it found there to be a clearly erroneous understanding of the facts. It says it in umpteen times throughout. It doesn't seem to be confused about what it's doing. And it's an agency, and so the agency gets some deference in here. If they tell us we find this to be clearly erroneous, and as it turns out, the argument that the BIA made, at least hypothetically, for why it's clearly erroneous is at least plausible or more than plausible, why are we questioning that that's what they're doing? I understand you have other arguments, but you seem to premise much of your arguments on this idea that we should not believe the BIA when it says we find this to be clearly erroneous and gives rational— I know you don't agree with them, but rational reasons for why it believed it to be clearly erroneous. You know, that seems like a hard line for us to police where we would say, well, it certainly seems wrong, but maybe it wasn't clearly wrong. The agency gets deference on that, no? I would disagree with that because the only permitted fact finder by the regulations is the IJ, and we only give— No, no, but that's a different argument, right? You understand that these are sequential arguments that you've made, right? The first argument you've made is that the BIA failed to comply with the clearly erroneous standard of review, right? So when it found the IJ got all this wrong, it says we are doing that by virtue of the clearly erroneous standard, and it says clearly erroneous a dozen times, right, in various contexts and in various ways, right? And so in doing that, right, you've said we should ignore the BIA's words and find that the BIA failed to apply the clearly erroneous standard. And I'm just—on that point, I understand you have other arguments. I have a hard time understanding how we are to do that. So I guess I would say a number of different things. I know that Your Honor just pointed out a number of different places where they cite clearly erroneous. I would point the court to JA-4, where the board specifically states, upon de novo review, we conclude that the respondent did not meet his burden of proof to establish the requisite likelihood of torture upon de novo review. But that only comes after it says we found these facts to be clearly erroneous, right? And once those clearly erroneous facts are removed, then I think it's exactly what it's supposed to do is to then do a review of whether the legal standard is met with the facts that were not found to be clearly erroneous, right? So that strikes me as exactly what courts do all the time. And that's a second-order question, but that's only after it determines what is clearly erroneous. And it says, like unbelievably clearly, right, we conclude the immigration judge's findings of fact are clearly erroneous. Yes, Your Honor. So let's start with where the BIA redlined things and then start to insert its own things that then potentially this court might try to defer to. One, they point to the fact that DA- Before you do that, so you're moving to the second argument, which is totally fine, right, that, yes, the BIA found this to be clearly erroneous, but you think it then engaged new fact-finding. That's a second argument. I understand that argument. But that's sort of conceding that the clearly erroneous standard was what the BIA applied, right? Oh, I totally disagree that the clearly erroneous standard was applied. I thought we were bracketing that for the sake of discussing the second argument. All right. You can go to the second argument if that's where you want to go. That's- Well, I- Please. I just think here- So let's look at the evidence that the board relied on. They said that DHS submitted evidence that there is sort of a non-gang tattoo culture. But what does that show us? Does that show us anything with regards to how those individuals are then later treated? And that evidence all predates the state of exception that is currently taking place. And the I.J. was very specific in her second decision to point that out, that the conditions have worsened because of the state of exception. All of that evidence predated when the state of exception in El Salvador started. And, additionally, the board relied on an outdated State Department report to try to rebut the later country conditions evidence that the I.J. relied on. So it seems weird to say, like, well, look, the board can slash out the I.J.'s current fact finding and we're going to go back and we're going to rely on stale evidence to try to rebut that without taking into consideration. It's almost a little comical to me that the B.I. doesn't reference any of the state of exception evidence when overturning it when clearly that would be a massive change in country conditions based off of the profile of an individual fitting the petitioner here. So- Mr. Osorio? Yes, Your Honor. Excuse me, sir. The BIA seems to be placed or appears to place great emphasis on a distinction of the record evidence of likelihood of being tortured versus likelihood of being mistreated. So could you go over for us the evidence in the record that you say that they ignored regarding the likelihood that Mr. Fredis would be tortured as opposed to mistreated should he be returned? Yes, Your Honor. So I would point the Court to JA-103 of the I.J.'s decision where she specifically discussed it, how there is arbitrary detention of Mindy individuals without gang ties and goes and gives a number of different sites to the record there. Also that police and other security forces- Is your argument that arbitrary detention by itself is torture? Not by itself, but I was going to sort of aggregate- I just want to tie back to Judge Keenan's question, which I was interested in, because she's trying to distinguish between torture or she's trying to get you to distinguish between torture and mistreatment. And your first example to that is that there's some arbitrary detention that's taking place, which seems to be on the wrong side of the line that you're arguing, right? If that's the best evidence that you've got is that there's some arbitrary detention, that doesn't seem to suggest that the finding that it's only mistreatment lacks substantial evidence. Well, I was going to aggregate with the other things that are taking place, Your Honor, that there's the arbitrary detention and then there's President Bukele who specifically said, we're going to detain all these individuals, then we're going to force starvation on them, which I would argue is torture. Additionally, police and other security forces have been implicated in hundreds of extrajudicial killings. I would argue that killing satisfies the definition of torture. There's been numerous instances in this state of exception where the Salvadoran government has basically licensed impunity. I get it. El Salvador has had a major gang problem for the last 30 years. So President Bukele has taken what some of us may view as a rational step in trying to wipe out and incarcerate the entire population. However, in the process of doing that, he's done and committed massive human rights violations and ended up picking up, as the record supports, ended up picking individuals who merely have tattoos, who merely live in – Do you think that human rights violations are limited to torture? I think forced starvation, I think forced – You can answer a different question later, but start with the question that I asked, which is do you think that all human rights violations are torture? No, Your Honor. That's what I'm trying to get at, right, is that we might agree or disagree with the approach that they're taking, but the question is why we think that this individual would be tortured. Again, I would point to the arbitrary killings that are taking place by the death squads. The vigilante death squads that the I.J. identified over 15 of from the record, they have been known to sweep neighborhoods and kill anybody suspected of being a gang member. All you have to do right now is report this to – There's a hotline in El Salvador that you can call and report somebody being a suspected gang member that's living in your neighborhood, and they come and pick them up, or death squads will kill them. Again, we may not have agreed with the I.J. in the first instance, but given the rules of the game that we have to play here and the standards of review, there simply wasn't enough. I mean, I would invoke the First Circuit stinks like a fish standard here. There wasn't enough to what? To overturn the I.J.'s factual findings. But don't we review that for, like, just substantial evidence, right? Given the BIA makes that decision and it says that it finds it clearly erroneous, we just have to ask, is there substantial evidence to support that judgment? It doesn't have to be our judgment, right? It doesn't have to be that we would overrule the I.J. as being clearly erroneous. We just have to be able to say there's substantial evidence that the BIA's determination, under its standard which it says, is correct. I disagree. I don't think the BIA can force its way into substantial evidence review when it has no factual finding ability. So how can – if we're going to give substantial evidence which only applies to factual questions, how can the BIA have deference on factual findings that the I.J. never made in the first instance? Like, that to me – I know that we're at the level we're at, but that to me we're flipping the standard because if they applied an improper standard, that should get no deference. But they said they applied the right standard, right? But they also – They say it over and over again. You just think they were lying, right? That they were not just mistaken. You would have us conclude that they're acting in bad faith. So when they say we review this for clearly erroneous, that, in fact, that was a bad faith statement, that they were not doing that and they were simply trying to trick us. But then I don't – I guess I'm very confused in how you deal with their own statement when they say upon de novo review, we conclude. Are you not arguing that the BIA has adopted a policy that they're going to reverse the I.J.'s grant relief? I think that the BIA – This is a matter of policy. They aren't going to go along with the I.J.'s rulings that grant relief. You're not arguing that – No, Your Honor. That they're doing something like that, are you? No, I mean I think that the BIA can overturn legal conclusions in the first instance that would have sort of an ultimate – Not only can, they're obligated to, aren't they? Yes, Your Honor. They're obligated to get it right. Yes, Your Honor. But I'm just saying – The I.J. is obligated to try to get it right. Everybody's trying to get it right. Yes, Your Honor. I just think that this Court has seen many I.J. decisions in its history, and given the sort of thoroughness and completeness of this specific decision, I think that if the Court were looking at that, it would have a very hard time utilizing the clearly erroneous standard to overturn what the I.J. did. Again, she cited it to the record more than 50 times, and given this actual underlying record, I just don't think that there's enough – Even if the BIA were to try to go to cherry-pick like they did with stale evidence or using sort of non-sequitur evidence that doesn't really rebut the I.J.'s findings, I still don't think there's a way to cherry-pick through this record to overcome the I.J.'s decision, Your Honor. And so for that, we would ask the Court to – Did you represent this fellow in the I.J. and BIA proceedings? So I did not represent him at the initial immigration judge decision, Your Honor. I represented him starting at the first BIA decision and then on the immigration judge remand and then back before the BIA and now before this Court. Okay. So you've been in the case. Not since the inception, yes, Your Honor, but for most of it. Well, he was pro se at the beginning. He was pro se and then because he was found incompetent, he got qualified representation, Your Honor. Yeah. Thank you very much. I do save some time. Thank you, Your Honor. Let's wait and let Judge Kenan ask the question. No, thank you. Okay. Ms. Du? Good morning, Your Honors. May it please the Court, Linda Doe for the respondent, the United States Attorney General. Here, the Board's reversal of the immigration judge's grant of CAT deferral was reasonable because substantial evidence supports the Board's determination that the immigration judge clearly erred in finding that petitioner would more likely than not be arbitrarily detained and tortured because of his non-gang tattoos and criminal history. The Board set forth three reasons finding clear error in the immigration judge's decision. First, the Board held that the immigration judge mischaracterized and failed to consider the significance of DHS's rebuttal evidence. Second, the immigration judge failed to distinguish between the likelihood of torture from that of lesser mistreatment. And third, the immigration judge relied on over-inclusive anecdotal evidence to find that petitioner would be at particularized risk of torture. It's important to note that in this case, petitioner was not tortured in the past and does not allege that anyone in El Salvador has an interest in him for any reason. His claim is premised on a chain of events that he speculates that will take place upon his return. Regarding the Board's first determination, the Board reviewed the immigration judge's and relied on the facts found by the immigration judge in noting that, including the testimony by petitioner's expert, Dr. Bishop. There, Dr. Bishop opined that tattoos were really the key and that they held such a gang significance that it would be nearly impossible for the public or officials to believe that any tattoo, regardless of its depiction, was not gang-related. And Dr. Bishop opined that there was a narrow exception for foreign expat surfers. Here, the Board explained that the immigration judge's finding was clearly erroneous because it failed to consider and mischaracterize DHS's rebuttal evidence, which the judge acknowledged included maps and listings of tattoo stores throughout the country as well as conventions. The evidence signified that the tattoo culture in El Salvador may be much more greater than that opined by Dr. Bishop and that simply having a tattoo was not definitive proof of gang affiliation. According to Dr. Bishop, any tattoo, Taylor Swift tattoos, rainbows, carebears, was sufficient to conclusively find that a person was a gang affiliate. Here, there was no indication that the country of El Salvador had banned tattoo shops or foreclosed the conventions due to its inherent and conclusive belief that tattoos were inherently gang-affiliated. Because the immigration judge mischaracterized the evidence and failed to consider the significance of the evidence, including the fact that there's tattoo stores located throughout the country, including in landlocked areas. You're saying everybody down in El Salvador has got tattoos? No, Your Honors, but DHS submitted evidence that there was tattoo parlors not only in the coast of El Salvador but throughout El Salvador indicating that customers were not limited to solely expat surfers and that they submitted pictures of tattoos of flowers and exotic animals showing that tattoos were not solely limited to the surfer culture or gangs, such that, again, just simply having a tattoo wasn't decisive and conclusive evidence of gang membership, as Dr. Bishop opined. And so finding the board held that the immigration judge clearly erred in this regard. Regarding the second determination, the board explained that the immigration judge erred in her predictive findings because she did not distinguish between the likelihood of torture and the likelihood of lesser mistreatment. BIA relied on the facts found by the immigration judge where she noted that deportees with tattoos had been harmed. In the immigration judge's decision, she noted that such harm included monitoring and tracking, which is at page 108 of the Joint Appendix, discrimination and harassment, which is at page 107, targeting, kidnapping, and beatings at page 103, and arbitrary arrests, detentions, torture, and extrajudicial killings. The board explained that the failure to distinguish between the likelihood of torture and mistreatment was clear error because the immigration judge had made a leap in logic and skipped steps to conclusively find that the petitioner would more likely than not be detained and ultimately tortured. The board expanded that harassment and lawful detention did not constitute torture. Accordingly, the BIA did not conduct de novo rue as petitioner opines or argues, but rather exercised its independent judgment to evaluate the legal significance of the evidence and the ultimate conclusion to which those facts lead. Moving to the third point, Your Honor, the immigration judge held that the predictive finding was clearly erroneous because the immigration judge relied on general anecdotal evidence to find that petitioner had a particular risk of torture. And so the board considered the immigration judge's findings of facts, including that he had relied on anecdotal evidence that death squads and the government had been known to commit extrajudicial killings and had been known to tamper with evidence. However, the incidents where death squads target persons such as the petitioner, persons with criminal histories, and non-gang-related tattoos was not quantified. Additionally, the evidence was over-inclusive, including confirmed gang members, suspected gang members, former gang members, as well as civilians. And it lacked the specific relevant details pertaining to petitioner's claim based on non-gang-related tattoos. The board also considered that the judge considered that there had been 296 complaints of misconduct, including torture, and found that the evidence did not suffice to correct the error because it did not show that tattoos significantly increased petitioner's risk of harm or that petitioner possessed a particularized or individualized risk of torture based on his non-gang tattoos. Having reviewed the entire record, the board was left with a firm and definite conviction that the immigration judge had made a mistake. In light of the foregoing, substantial evidence supports the board's determination that the immigration judge's factual finding was clearly erroneous. I request that the court deny the petition for review. Your request is that we deny the petition for review, not that we affirm. Just deny the petition for review is what your position is, right? Or uphold the board's position. What do you want us to do? What the government wants us to do is affirm, uphold, or deny the petition for review. Deny the petition for review, Your Honor. If there are no further questions. Thank you very much. Thank you. Ms. Osorio? Yes, Your Honor. I just would point out a couple things quickly with regards to the tattoo. The findings are not that his tattoos won't be viewed as gang-related. The findings are that he has tattoos that are not actually gang-related, but I.J., again, the only one who has factual finding authority here, through the testimony of the expert witness found that they would be viewed as gang-affiliated and including he had different numeric tattoos that given the MS-13 and 18th Street, that was one of the reasons that she opined that they might be affiliated or viewed as affiliated. So even though he has non-gang tattoos, the Salvadoran authorities, and that was the factual findings by the I.J., are going to view them as gang-affiliated. So it's not. I thought your argument or Bishop's claim was that anybody with any tattoos, because nobody in El Salvador uses tattoos except gang members, and so if you're in El Salvador and you have tattoos and you're not on a surfboard, then you are going to be a suspected gang member, whether that's like the little butterfly on the ankle or the teardrop on the face. Her claim, it seemed to me, was not specific to your client, but instead was that nobody, there is no tattoo culture, surface accepted, that's not gang-related in the entire country. I mean, that seemed to be what she said. I took Dr. Bishop's point as being anybody who has tattoos is suspect, and then upon further examination of those tattoos, especially in light, like I said, in this case where the petitioner has numeric tattoos on his body, that then they can become to be viewed as gang-affiliated. So where do you want me to read that? Because that doesn't seem to be what she actually says. I mean, that might have been a better argument. I'm not sure that it helps here, but where would I read that just when I go to the JA? Because when I read her testimony, it didn't come across that way, but I may have skipped over the part that you're talking about. I don't have the page number in front of me, Your Honor. I can submit a 28J. But the IJ's factual findings that cite to Dr. Bishop's testimony explain that this petitioner's tattoos is going to be viewed as gang-affiliated. And so, again— But your testimony is Dr. Bishop considered the specific tattoos that your client had and said everybody with tattoos are suspicious, but his would be particularly suspicious because the dragon or whatever it was. And some of the Egyptian, I believe, symbolic stuff she believed. Her testimony was that that was what was going to make it, not just tattoos in general, but his particular tattoos. She reviewed his tattoos and provided a basis for finding that his particular tattoos were the problem. It wasn't just tattoos in the country in general, but it was his specific tattoos? I think her testimony, again, is that tattoos is not a commonplace thing throughout El Salvador, and that's what the department's evidence was intended to try to rebut, that there are these presence of tattoo parlors in El Salvador. There's a surfing community. But then, you know, so given that it's not common and given that historically it has been utilized by the gangs, her opinion was that tattoos put everybody on high alert. And then upon further inspection, and it's in the record, when individuals are deported to El Salvador, they're stripped down, they're identified by their criminal history, their tattoos are marked. And so the IJ's findings followed that to find and conclude. I understand the IJ, but is Dr. Bishop the one that's connecting this, or are you connecting it? No, I believe the IJ connected it using Dr. Bishop's testimony and the country conditions evidence that was in the record. To your client in particular, his tattoos? Yes, Your Honor, to make a particularized determination for how this particular individual is going to be treated going forward. And so if, again, the court does not believe our first point that the board necessarily engaged in clear error by reversing the IJ, I would still argue that our strongest point here should be then if the BIA believes that clear error has been committed, it must remand so that the factual findings can be made by the IJ in the first instance with those errors pointed out, that the board lacks authority to make an initial predictive finding of a likelihood of... Do you think that's true for the Fourth Circuit as well? Because we say in a variety of contexts that even on agency review where the agency is supposed to make fact-finding, that we can, at least in some cases, say that the evidence presented here leads to only one conclusion. And so it's unusually odd for us to say that the BIA can't say, as it seems to do here, that your client, absent the clearly erroneous factual findings of the IJ, failed to meet his burden, and therefore the petition's denied. The application's denied. I'm sure Judge King will let you answer. Thank you, Your Honor. So just quickly, I would say that may be true on the acquiescence piece. I still think, and I would point to my 28J letter on Santos-Zacharia, the recent Fifth Circuit decision here, that there are times that, yes, the BIA is barred, and it's barred by its own regulations, from engaging in initial fact-finding. And I just think that when you compare the IJ's decision to the BIA's decision, it is obvious on its face that the BIA has done that. And because of that, that's sort of an abuse of discretion. That's a violation of the legal standards of review that should be in place, and for that, it should be remanded. Thank you. Thank you very much, sir. We appreciate it. We'll come down and greet counsel.
judges: Robert B. King, Julius N. Richardson, Barbara Milano Keenan